## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ANGELICA AYERS, on behalf of herself )
and all others similarly situated, )
    )
DEBRA BAKER, on behalf of herself )
and all others similarly situated, )
    )
COLLEEN BLISS, on behalf of herself )
and all others similarly situated, )
    )
BETH BOWMAN, on behalf of herself )
and all others similarly situated, )
    )
BAILEY BUGNER, on behalf of herself )
and all others similarly situated, )
    )
MELANIE BUGNER, on behalf of herself )
and all others similarly situated, )
    )
TERESA BURNS, on behalf of herself )
and all others similarly situated, )
    )
LINDA GOUCHENOUR, on behalf of )
Herself and all others similarly situated, )
    )
SHAWNA HANSEN, on behalf of herself )
and all others similarly situated, )
    )
DONNA HERMAN, on behalf of herself )
and all others similarly situated, )
    )
KARRY HUFF, on behalf of herself )
and all others similarly situated, )
    )
JOAN PARNELL, on behalf of herself )
and all others similarly situated, )
    )
MCKAYLA PEELEN, on behalf of herself )
and all others similarly situated, )
    )
LAUREN RIISOE, on behalf of herself )
and all others similarly situated, )
    )
JILL SAGE, on behalf of herself )
and all others similarly situated, )
    )

RONEDA SAUERBRUNN, on behalf of          )
herself and all others similarly situated,   )
                                         )
CARLA SCHEER, on behalf of herself       )
and all others similarly situated,       )
                                         )
JOANNA TALBERT, on behalf of herself     )
and all others similarly situated,       )
                                         )
CRYSTAL WELDIN, on behalf of herself     )
and all others similarly situated,       )
                                         )
v.                                       )          Case No.:
                                         )
ASCENSION HEALTH ALLIANCE,               )
a Missouri non-profit corporation,       )
                                         )
              Defendant.                 )

## VERIFIED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW Plaintiffs, Angelica Ayers, Debra Baker, Coleen Bliss, Beth Bowman, Bailey Bugner, Melanie Bugner, Teresa Burns, Linda Gouchennour, Shawna Hansen, Donna Herman, Karry Huff, Joan Parnell, McKayla Peelen, Lauren Riisoe, Jill Sage, Roneda Sauerbrunn, Carla Scheer, JoAnna Talbert, Crystal Weldin, on behalf of herself and all others similarly situated, by and through counsel, and requests the Court enter declaratory judgment for Plaintiffs and immediately enter a Temporary Restraining Order with Notice and/or an Emergency Preliminary Injunction, pursuant to Fed. R. Civ. P. 65, forbidding Defendant and its agents, affiliates, subsidiaries, and all persons acting in concert with it, from terminating or disciplining Plaintiffs for failing to comply with Defendant's Mandatory Vaccination Policy. In support, Plaintiffs states as follows:

## INTRODUCTION

The Biden Administration began its aggressive campaign to vaccinate every American in July 2021, focusing on private employers as a key part of its national strategy. By July 28, 2021, Ascension

— the second-largest hospital chain in the country, with half or more of its revenue controlled by the federal government, and now addicted to billions of dollars in CARES Act pandemic funding — fell into line, and ordered its employees to be vaccinated for **COVID-19** or seek employment elsewhere. It also cancelled all existing vaccine-related religious exemptions — longstanding exemptions that it had been routinely granting for years. It told employees to re-apply in the fall for those previously approved, longstanding exemptions.

When the employees re-applied in the fall, they were provided with a brand-new website for exemption requests, combining the previous process for obtaining flu vaccine exemptions with the new **COVID-19** vaccine requirement. The new "exemptions portal" had a novel feature: a box that employees had to check in order to submit their exemption request. The box said the employees agreed that, if their requests were denied, then they would "voluntarily resign." Check the box to proceed. Ascension then summarily denied all, or nearly all, employee exemptions.

Unsatisfied with employee mandates, Ascension followed the federal government's lead and also required all contractors and providers to mandate vaccination, or else their contracts would be terminated, creating a daisy-chain of coerced, unwanted medical treatments forced on ordinary, law-abiding Americans under threat of severe economic dislocation.

Ascension's timing is not terrific. Kansas law prohibits employers from denying religious exemptions. The survival rates for **COVID-19** infected patients between the ages of 20 and 50 —like the majority of the potential class members— is over 99.98%. Even between ages 50 to 70, it exceeds 99.5%. These statistics include infected people at high risk for **COVID-19** mortality. The potential class members — all frontline healthcare workers — are much healthier overall than the general population. Many of them have already acquired natural immunities to the disease from on-the-job exposure. The potential class members' chances of survival are much higher even than the stock figures.

In other words, Ascension's Vaccine Mandate offers no statistical benefit to its hospitals in terms of reducing mortality over baseline levels. The vaccines do not prevent transmission. There is no rational basis for Ascension's coercive policy except that it is being compelled to do so by the federal government, and it has agreed to help the federal government effectuate a broad national public health objective.

Like the employees whose livelihood is being threatened by Ascension, Ascension's livelihood is being threatened by the federal government.

Because the federal government cannot directly mandate vaccines — that would be an unconstitutional invasion of the right to privacy and bodily autonomy —it has created a web of related and unrelated federal threats, bribes, incentives and sanctions designed to coerce private actors like Ascension to do what it cannot: require citizens to accept unwanted medical treatments.

Ascension Health's Vaccine Mandate does not further the Ascension's mission of treating individual patients. Instead, it implements and furthers the traditional government job of broad public health management by effectuating delivery of federal property (the vaccines) into the bodies of private citizens. Defendant is not acting voluntarily, but rather has been massively incentivized and coerced into implementing the government's policy through its Vaccine Mandate — trampling Plaintiffs' state and federal statutory and constitutional religious liberties and privacy rights.

## JURISDICTIONAL ALLEGATIONS

1.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States, as well as under 42 U.S.C. §1983, relating to Defendant's intent to deprive Plaintiffs of certain rights, privileges, and immunities.

2.      This Court has the authority to award the requested declaratory relief under 28 U.S.C. §2201, the requested injunctive relief under 28 U.S.C. §1343(a), and attorneys' fees and costs under 42 U.S.C. §1988.

3.      The District of Kansas is the appropriate venue for this action pursuant to 28 U.S.C. §1391(b)(1) and because Ascension Health is a foreign corporation subject to long-arm jurisdiction in Kansas. It is also the district in which a substantial part of the events giving rise to Plaintiffs', and all other similarly situated Ascension Health employees in Kansas, claims have occurred and continue to occur.

## PARTIES

4.      Defendant Ascension Health Alliance ("Ascension Health") is a Missouri nonprofit corporation and may be served via its registered agent CSC-Lawyers Incorporating Service Company, 221 Bolivar Street., Jefferson City, MO 65101. This Court has long-arm jurisdiction over Ascension Health since it conducts substantial business activity in Florida through its local subsidiaries, enjoys a unity of identity with them, and is responsible for implementing the policy giving rise to Plaintiffs' claims.

5.      Defendant forms a corporate network of Catholic hospitals, which refer to themselves as religious organizations.

6.      Ascension Health offers two "Sites of Care" in the State of Kansas: Ascension Via Christi and St. Joseph Place.[1]

7.      Ascension Health exerts substantial control over its subsidiaries, as demonstrated by, *inter alia:*

   a.   Ascension Health describes itself on its "About" page as a "faith-based healthcare organization," which "includes more than 150,000 associations and 40,000 aligned

---

[1] *See Sites of Care*, https://www.ascension.org/Our-Work/Sites-of-Care/KANSAS (Last visited Dec. 8, 2021).

providers . . . [, and] operates more than 2,600 sites of care – including 142 hospitals and more than 40 senior living facilities – in 19 states and the District of Columbia;[2]

b.  It maintains a consistent website design and presentation, for itself and its subsidiary hospitals and sites of care;[3]

c.  It implements systemwide initiatives, such as its Green Teams ,which collaborate with Environment of Care committees at each Ascension site of care "to drive green practices;"[4]

d.  It uses common supplies for its sites of care, such as the common Food and Nutrition Services Provider it uses for its hospitals;[5]

e.  It implements common employment policies across the Ascension Health system, such as the vaccination policy at issue in this suit, which applies to all Ascension "associates" including those who employ Plaintiffs and all others similarly situated;[6] and

f.  Ascension Health's subsidiaries are organized pursuant to its common corporate purposes.

8.      Ascension Health also has a strong unity of financial interest with its subsidiaries, evidenced by its "Community and Investor Relations" page, which contains reports solely on the

---

[2] *About,* https://ascension.org/About (last visited Nov. 30, 2021).
[3] https://healthcare.ascension.org/locations?page=1&facility=&location=Wichita,%20KS&distance=50&filter= (last visited Nov. 30, 2021). For example, the "Career Search" link at the top of the pages, lead to a page with a search box for jobs across the Ascension Health system. At this pages, there are descriptions of "Life at Ascension." Including a common culture, benefit plan description, and mission of inclusion for all Ascension Health "associates". In addition, the map under "Our National Network" on the career page highlights Kansas as one of Ascension Health's locations.
[4] *See* Fiscal Year 2021 Environmental Impact & Sustainability Report ("Sustainability Report") at p. 8, attached at **Exhibit 1.** The Sustainability Report gives examples of how "[f]ollowing Ascension Design & Construction Standards" The Ascension Via Christi Concierge Primary Care Clinic – Spirit Campus, in Wichita, used modular products. *Id* at p. 11.
[5] *See Id* at 14.
[6] *See For safety of communities, Ascension to require COVID-19 vaccination for associates* (July 27, 2021), https://www.ascension.org/News/News-Articles/2021/07/27/15/59/Ascension-to-Require-COVID-19-Vaccination.

combined financials of Ascension Health and its subsidiaries as one system[7], including as of June 30, 2021, "approximately 150,000 associates and 40,000 aligned care providers, operating more than 2,600 sites of care – including 146 hospitals and more than 40 senior living facilities – in 19 states and the District of Columbia…."[8]

9.  The Management Discussion, the Ascension Consolidated Financial Statements, **Exhibit 3,** and Supplementary Information, and the Ascension Consolidated Statistical Information, **Exhibit 4,** all provide consolidated data on Ascension Health and its subsidiaries, without differentiating between the data of Ascension Health and that of its subsidiaries. The picture presented to investors and the public, then, is one of Ascension Health and its subsidiaries as a unified, cohesive, multistate organization.

10.  Defendant does not require employees to subscribe to any statement of faith.

11.  Ascension Health created the vaccination policy at issue in this case is currently implementing and enforcing the policy.

12.  According to publicly available financial information, Ascension Health received $1.796 **billion dollars** in federal aid related to the pandemic for fiscal year 2020-21. *See Management's Discussion* at p. 7. A

13.  Ascension Health reported an operating income of $676 million and an investment-buoyed $5.7 billion net income for the fiscal year ending June 30, 2021.[9] Ascension Health has $15.5 billion in cash and operates a venture capital fund.[10]

---

[7] *See Community and Investor Relations,* http://ascension.org/about/community-and-investor-relations (last visited Nov. 20, 2021).

[8] Management's Discussion and Analysis of Financial Condition and Results of Operations for Ascension ("Management's Discussion") at p. 1. **Exhibit 2.**

[9] *See* "ascension latest nonprofit rebound with $5.7B net income for 2021." https://www.fiercehealthcare.com/hospitals/ascension-latest-nonprofit-to-rebound-5-7b-net-income-for-2021 (last visited Nov. 30, 2021).

[10] *See* Wikipedia, "Ascension (Company)" https://en.wikipedia.org/wiki/Ascension_(company)#cite_note-4 (last visited Nov. 30, 2021).

14.     In 2021, Ascension Health was ranked the third-largest hospital system in America.[11]

15.     Plaintiffs are healthcare workers and employees of Ascension Health and are subject to Ascension Health's employment policies, including the employment policy at issue in this case.

16.     Plaintiff Angelica Ayers is a respiratory therapist who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

17.     Plaintiff Debra Baker a RN who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

18.     Plaintiff Coleen Bliss is a patient access representative who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

19.     Plaintiff Beth Bowman is a review analyst who submitted both a religious and a medical exemption request which were both denied by Defendant and put on unpaid suspension.

20.     Plaintiff Bailey Bugner is a Registered nurse who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

21.     Plaintiff Melanie Bugner is a medical lab scientist who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

22.     Plaintiff Teresa Burns is a case manager who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

23.     Plaintiff Linda Gouchennour is a medical records coder who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

24.     Plaintiff Shawna Hansen is an employee and/or agent who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

---

[11] *See* Becker's Hospital Review, "100 of the largest hospitals and health systems in America | 2021", https://www.beckershospitalreview.com/100-of-the-largest-hospitals-and-health-systems-in-america-2021.html (last visited Nov. 30, 2021).

25.     Plaintiff Donna Herman is a certified physical assistant who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

26.     Plaintiff Karry Huff is a registered nurse who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

27.     Plaintiff Joan Parnell is the Regional Director-Business Operations and worked primarily from home. Plaintiff Parnell submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

28.     Plaintiff McKayla Peelen is a PRN and a certified occupational therapy assistant who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

29.     Plaintiff Lauren Riisoe is a RN who submitted both a religious and medical exemption request. Plaintiff Riisoe's religious exemption was denied, and her medical exemption was accepted on a temporary basis. On information and belief when Plaintiff Riisoe's medical condition ends, Defendant will revoke her temporary exemption.

30.     Plaintiff Jill Sage is a LPN who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

31.     Plaintiff Roneda Sauerbrunn is an administrative assistant who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

32.     Plaintiff Carla Scheer is a Cardiopulmonary Nurse Educator and a RN who submitted both a religious and a medical exemption request which were both denied by Defendant and put on unpaid suspension.

33.     Plaintiff JoAnna Talbert is a pharmacist who submitted a religious exemption request which was denied by Defendant and put on unpaid suspension.

34.     Plaintiff Crystal Weldin is a PRN who submitted a religious exemption request which was denied by Defendant and was constructively discharged. In addition, Plaintiff Weldin is a nursing student at Butler Community College who host required clinical courses at Defendant locations. Defendant has accepted Plaintiff Weldin's religious exemption as a student who attends clinicals, but denied her request as an employee.

## COLLECTIVE AND CLASS ACTION ALLEGATIONS

35.     Plaintiffs brings their claims as an opt out class action, as defined below, pursuant to Fed. R. Civ. P. 23. Plaintiffs, individually, and on behalf of others similarly situated, seeks relief on a class basis challenging Defendant's practice of discriminating against others based on their religious beliefs. The Rule 23 class is defined as:

> All Ascension personnel and contractors employed by Defendant in Kansas who have been placed on unpaid suspension or otherwise constructively discharged for not receiving the COVID-19 vaccine after their religious and/or medical exemption requests were denied.

36.     The class satisfies the numerosity standards. Joinder of all class members would be impracticable.

37.     There are questions of law and fact common to the class that predominate over any questions affecting individual members. The questions of law and fact common to the class arising from Defendant's actions include, but not limited to, the following:

a.  Whether Defendant is a state actor, who acting under the color of law, discriminated against Plaintiffs, and those class members similarly situated, based on their religious beliefs;

b.  Whether Defendant discriminated against Plaintiffs in violation of the Kansas Constitution and the Kansas Religious Protection Act;

      c.    Whether Defendant violated Kansas Senate Bill 2001, effective Nov. 23, 2021, by its continued refusal to grant Plaintiffs, and those class members similarly situated, their religious exemption from the Ascension Policy Mandate; and

      d.    Whether Defendant violated the First and Fourteenth Amendments of the United States Constitution when it discriminated against Plaintiffs, and those class members similarly situated, based on their religious beliefs.

38.    Plaintiffs' claims are typical of those of the Class in that class members have been placed on unpaid administrative suspension for not taking the Covid-19 vaccine injections.

39.    A class action is the appropriate method for the fair and efficient administration of this controversy. Defendant has acted or refused to act on grounds generally applicable to the class. The presentation of separate actions by individual class members would create a risk of inconsistent and varying results, risk the establishment of incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of class members to protect their interests.

40.    The Plaintiffs are an adequate representative of the class because her interests do not conflict with the interests of the members of the class she seeks to represent. The interests of the class will be fairly and adequately protected by the Plaintiffs acting as Class Representative and her undersigned counsel, who has experience in employment and class action lawsuits.

41.    Maintenance of this action as a class action is a fair and efficient method to resolve this controversy. It would be impracticable and undesirable for each member of the class who suffered harm to bring a separate action. Furthermore, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a class action can determine the rights of all class members in conformity with the interest of efficiency and judicial economy.

42.     Plaintiffs, individually and on behalf of all other similarly situated employees, seeks relief on a collective basis challenging Defendant's actions. The number and identify of other plaintiffs yet to opt-in and consent to be party plaintiffs may be determined from the records of Defendant, and potential class members may easily and quickly be notified of the pendency of this action.

43.     To the extent required by law, notice will be provided to said individuals via first class mail, email and/or by the use of techniques and a form of notice similar to those customarily used in representative actions.

## THE "VACCINATE OR TERMINATE" POLICY

44.     In late July, 2021, the Defendant announced, through formal and informal communications that, Plaintiffs must receive two injections of the mRNA COVID-19 drug or one injection of Johnson & Johnson's formulation, in addition to the annual influenza vaccine, prior to November 12, 2021 ("the Mandatory Deadline"), or they will be constructively terminated by being placed on unpaid leave or "deemed'" to have resigned.

45.     Contractors of Ascension Health also face termination of their contracts or constructive termination of their contracts. Collectively, the policy will be referred to as the "Vaccine Mandate."

46.     Defendant's stated purpose for the Vaccine Mandates is that "when everyone is vaccinated, everyone is safer."[12]

47.     Defendant has stated it will accommodate religious and medical exceptions to the Vaccine Mandate.

48.     Plaintiffs do not want to take the injection as she believes taking the injections goes against her sincerely held religious beliefs.

49.     Nor do Plaintiffs believe the injections are medically necessary.

---

[12] October 22, 2021, memorandum to associates.

50.     Plaintiffs submitted their religious exemption request to Defendant, following Defendant's submission guidelines.

51.     Plaintiffs' religious exemption request was denied by Defendant.

52.     Many of the potential class members were previously infected with COVID-19 while working for Defendant during the peak of the pandemic. These potential class members now have durable and long-lasting natural immunity. The injection would offer no benefit whatsoever to them but, instead, would create unwanted risk encountering adverse reactions to the injection.

53.     After instituting the Vaccine Mandate, Defendant repeatedly asserted, orally and in writing, that parties who did not comply would be "deemed to have resigned."

54.     Defendant also stated that employees who failed to comply with the Vaccine Mandate would be placed on un-paid leave and removed from their work schedules.

55.     On November 12, 2021, Plaintiffs, and all others similarly situated, who had applied for a religious and/or medical exemption, were not granted a religious or medical exemption and were placed on unpaid suspension.

56.     The only vehicle Defendant provided for submitting a "religious accommodation request" was through a web portal. The portal contains a box that must be confirmed to continue processing the "request."

57.     The box states, among other things, "I understand that should I fail to be vaccinated or granted an exemption on or before 5:00 pm on November 12, 2021, I will be suspended…Continued failure to comply will be deemed voluntary resignation."

58.     This is not voluntary resignation. This is constructive termination. There is nothing voluntary about the Vaccine Mandate.

59.     Defendant's purpose for the Vaccine Mandate is to help the federal government achieve its goal of 95%+ vaccination rate of the entire U.S. population, to avoid penalties and sanctions, and to earn billions of dollars in incentives.

60.     The Vaccine Mandate does not include <u>any</u> consideration of persons having durable and long-lasting natural immunity.

### DEFENDANT'S PRIOR POLICIES REGARDING OTHER VACCINES

61.     Ascension Health has a policy requiring employees to take annual vaccines for influenza. Prior to 2021, employees could request and easily obtain a "permanent" opt-out for religious, moral, or medical reasons.

62.     These influenza accommodations were readily granted by Ascension Health and many of the potential class members were accommodated by them.

63.     In April 2021, Ascension Health notified employees, including Plaintiffs, that all permanent religious accommodations were ending and employees would have to renew their accommodation requests in the fall.

64.     Ascension Health has now tied influenza accommodation requests to COVID-19 vaccine accommodation requests, making a single request for both drugs.

65.     Prior to the enactment of Kansas House Bill 2001, Ascension Health has denied all, or nearly all, religious accommodation requests.

66.     Many Plaintiffs who formally had permanent influenza accommodations were not granted renewed influenza exemptions.

### KANSAS' NEW LAW PROHIBITS DEFENDANT'S ACTIONS

67.     Defendant's actions are illegal.

68.     On November 23, 2021, Kansas Gov. Laura Kelly signed House Bill 2001, following a special session called by the Kansas Legislature.

69.     This new law requires that, if a Kansas employer imposes a COVID-19 vaccination requirement, the employer must exempt an employee from such requirement without punitive action, if the employee submits a written waiver request to the employer stating that complying with such requirement would either (1) endanger the life or health of the employee or an individual who resides with the employee, or (2) violate the employee's sincerely held religious beliefs.

70.     The new law also explicitly requires employers grant religious exemptions "without inquiring into the sincerity of the request."

71.     These exemption requests must be in writing.

72.     Plaintiffs and all others similarly situated submitted their exemptions in writing through the Ascension provided portal.

73.     Plaintiffs' and all others' similarly situated written religious exemption requests have been summarily denied.

74.     About two (2) weeks after the new law became effective, Defendant and/or Defendant's agents notified Plaintiff, and those similarly situated, that she could return to her job.

75.     Defendant orally told Plaintiffs, and other similarly situated, that her religious exemption denial has been rescinded.

76.     To date, Defendant has not granted Plaintiffs' religious exemption as required by the Kansas Law.

**THE VACCINE MANDATE DOES NOT FURTHER A COMPELLING INTEREST**

77.     The vaccines available in the United States – Pfizer, Moderna, and Johnson & Johnson ("the Vaccines") – share similar characteristics with each other.

78.     The Vaccines are non-sterilizing; a vaccinated person can still become infected and transmit the virus to others.[1314]

79.     The Vaccines do not provide any lasting immunity to the COVID-19 virus.

80.     Recent studies suggest the Vaccines' immunity begins to wane as soon as five weeks after the second injection.

81.     Under traditional definitions, the Vaccines are not "vaccines," but rather are more accurately described as therapeutics, since they do not prevent infection but rather may only ameliorate the severity of the disease.

82.     Recent studies suggest that injected people have the same or greater viral load in their upper respiratory systems.

83.     Persons who receive the COVID-19 injection and are subsequently exposed to an infection are equally, if not more contagious, than persons who have not received the COVID-19 injection.

84.     Studies have suggested that vaccinated persons may even spread the virus more easily, either because they have high levels of virus in their upper respiratory area, or because they are more likely to be asymptomatic and therefore less likely to know they are contagious and take precautions.

85.     Being injected does not "protect others" or keep other persons "safe."

86.     Defendant does not require patients to be vaccinated prior to admission to their facilities.

87.     Even if vaccination did prevent transmission – which it does not – infected patients can transmit the virus to staff.

---

[13] The CDC states "…preliminary evidence suggests that fully vaccinated people who become infected ,,, can spread the virus to others." https://www.cdc.gov/coronavirus/2019-nciv/vaccines/fully-vaccinated-guidelines.html.

[14] "[W]hat [the vaccine] can't do anymore is prevent transmission." CDC Director Rochelle Walensky, August 6, 2021, https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

88.     A vaccinated employee can spread the disease to patients, whether they are vaccinated or not.

89.     Defendant's claim that Ascension employees must be injected to protect other staff and patients is a pretext.

90.     The Vaccines have generated more adverse event reports in the Vaccine Adverse Event Reporting System (VERS) than all other vaccines combined. Even this remarkable figure is more likely understated.

## THE VACCINE MANDATE IS NOT THE LEAST RESTRICTIVE MEANS

91.     There are less restrictive means available to achieve the legitimate purpose allegedly ascribed to vaccination.

92.     Alternative treatments, including Remdesivir, steroids, Vitamin D, ivermectin and monoclonal antibody treatments, have been shown to prevent infections and reduce severity and mortality from COVID-19 infections.

## COERCION FROM THE FEDERAL ADMINISTRATION (STATE ACTOR)

93.     The Biden Administration has announced an aggressive policy aimed at achieving very high rates of vaccination.

94.     The Federal government cannot directly mandate vaccines; a federal mandate would be an unconstitutional invasion of the right to privacy and bodily autonomy.[15]

---

[15] "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment[.]" *Cruzan by Cruzan v. Dir., Missouri Dept. of Health*, 497 U.S. 261, 278 (1990). "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990); *See also Washington v. Glucksberg*, 521 U.S. 702, 725 (1997) ("Given the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment, our assumption was entirely consistent with this Nation's history and constitutional traditions.")

95.     The Biden Administration is coercing private employers like Ascension Health to implement "vaccinate or terminate" policies, by, *inter alia*:

    a.   threatening them with a fine of up to $700,000 per employee;[16]

    b.   threatening to cut off Medicare reimbursements to hospitals;[17]

    c.   issuing an executive order applying to broadly defined "federal contractors,"[18] and

    d.   directing OSHA to formulate an emergency rule providing for penalties and fines on employers who have not complied.[19]

96.     Upon information and belief, federal officials have communicated with Ascension Health officials to pressure them directly to implement these "private" mandates.

97.     President Joe Biden began lobbying private companies like Ascension Health in July – just before the Vaccine Mandate was announced:

> The President announced vaccination requirements for the federal government in July and called on the private sector to do more to encourage vaccination as well. Since that time, employers, schools, nursing homes, restaurants, hospitals, and cities in all 50 states have announced new vaccination requirements. Since

---

[16] *See* Adam Andrzejewski, *Biden's Vax Mandate to be Enforced by Fining Companies $70,000 to $700,000?*, Forbes (Sept. 28, 2021, 1:21 PM), https://www.forbes.com/sites/adamandrzejewski/2021/09/28/bidens- vax-mandate-to-be-enforced-by-fining-companies-70000-to-700000/?sh=3be663791c0d (reporting that Biden intends to enforce COVID-19 vaccine mandate on companies employing 100 or more people, and noting an enforcement mechanism added to the House of Representatives' $3.5 trillion reconciliation bill, which would amend 29 U.S.C. § 666 to impose up to $700,000 in fines "for willful or repeated violations" of OSHA rules likely to be used to enforce the vaccine mandate).

[17] *See Biden-Harris Administration to Expand Vaccination Requirements for Health Care Settings*, Centers for Medicare & Medicaid Services, (Sept. 9, 2021), https://www.cms.gov/newsroom/press-releases/biden-harris-administration-expand-vaccination-requirements-health-care-settings ("The Centers for Medicare & Medicaid Services (CMS), in collaboration with the Centers for Disease Control and Prevention (CDC), announced today that emergency regulations requiring vaccinations for nursing home workers will be expanded to include hospitals, dialysis facilities, ambulatory surgical settings, and home health agencies, among others, as a condition for participating in the Medicare and Medicaid programs.")

[18] *See* Proclamation No. 14042, 86 Fed. Reg. 50,985 (Sept. 9, 2021).

[19] *See White House Announces Vaccination Mandate or Weekly Testing for Large Employers, and Vaccination Mandate for Federal Employees and Contractors*, National Law Review, Volume XI, Number 253 (Sept. 10, 2021), *available at:* https://www.natlawreview.com/article/white-house-announces-vaccination-mandate-or-weekly-testing-large-employers-and (noting that OSHA "is developing an emergency temporary standard" requiring that large employers impose vaccine mandate and that "OSHA will have the ability to fine non-compliant businesses up to $14,000 per violation").

July, the share of job postings that require vaccination are up 90%. And we know these requirements work.[20]

98.     The Defendant's Vaccine Mandate is part of a coordinated group of large companies all across the United States requiring vaccines from employees even though they stand to lose substantial amounts of money from the direct and indirect consequences.[21]

99.     Ascension's Management's Discussion and Analysis of Financial Condition and Results of Operations for Ascension for the year ending July 2021 disclosed that the Ascension "System received $1.8 billion of distributions from the Provider Relief Fund, [established under the CARES Act,] during both the fiscal years ended June 30, 2021 and 2020." **Exhibit 2**.

100.     Page 20 of Ascension's Consolidated Financial Statements (Q4) for Fiscal Year 2021 discloses "[p]ayments from the Provider Relief Fund are to be used to prevent, prepare for, and respond to coronavirus, and shall reimburse the recipient for health care related expenses and lost revenues attributable to coronavirus." **Exhibit 3**.

101.     On September 9, 2021, CMS published a press release on its website, recapitulating various public statements from the Biden Administration over the previous weeks:[22]

> The Biden-Harris Administration will require COVID-19 vaccination of staff within all Medicare and Medicaid-certified facilities to protect both them and patients from the virus and its more contagious Delta variant. Facilities across the country should make efforts now to get health care staff vaccinated to make sure they are in compliance when the rule takes effect.

102.     The Medicare/CMS penalties attached to Defendant's potential failure to meet federal government targets for vaccination would make Defendant financially non-viable.

---

[20] The White House, "Path out of the Pandemic: President Biden's COVID-19 Action Plan," *available at:* https://www.whitehouse.gov/covidplan/.

[21] See, e.g., Southwest Airline's vaccine mandate, even though CEO Gary Kelly said he has "never been in favor of corporations imposing that kind of a mandate. I'm not in favor of that, never have been." *Available at* https://www.cnbc.com/2021/10/12/covid-vaccine-southwest-ceo-gary-kelly-says-he-never-wanted- a-mandate.html.
[22] *Available at* https://www.cms.gov/newsroom/press-releases/biden-harris-administration-expand- vaccination-requirements-health-care-settings.

## PUBLIC FUNCTION (STATE ACTOR)

103.    Ascension Health's Vaccine Mandate implements and furthers the traditional state goal of public health management.

104.    The Vaccine Mandate is a mandatory vaccination policy aimed at broad public health objectives that have traditionally been the province of government.

105.    Implementing and enforcing a vaccination mandate in response to a pandemic is traditionally a public function. *See, e.g. S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, (2020), 141 S. Ct. 10, 12, 208 L.Ed.2d 155, 156 (2020) ("Our Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States to guard and protect.") (quotes omitted); *Jacobson v. Massachusetts*, 197 U.S. 11, 29, 25 S. Ct. 358, 362 (1905) ("[I]t is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand").

106.    The Vaccine Mandate constitutes performance of a public function with the government's acquiescence. *See, e.g., Marsh v. Alabama*, 326 U.S. 501, 507, 66 S. Ct. 276, 279 (1946) ("And even had there been no express franchise but mere acquiescence by the State in the corporation's use of its property as a segment of the four-lane highway, operation of all the highway, including the segment owned by the corporation, would still have been performance of a public function and discrimination would certainly have been illegal").

107.    The Vaccines are the property of the federal government, and remain the property of the federal government until they are injected into citizens:

At this time, all COVID-19 vaccine in the United States has been purchased by the United States Government for administration exclusively by enrolled

> providers through the CDC COVID-19 Vaccination Program. Vaccine remains
> U.S. government property until administered to the vaccination recipient.[23]

108.    The Vaccine Mandate is intended to assist the federal government with delivering its property into the bodies of citizens, including Plaintiffs' and all others similarly situated.

109.    The Defendant's broad, undifferentiated, non-individualized vaccination policy does not reduce the spread of the virus in the hospitals, or prevent patient or staff infections, but serves only to help further the government's stated goal of reaching certain population rates of vaccination.

110.    Ascension Health operated throughout 2020 and most of 2021 without a Vaccine Mandate, during which time many, if not most, of its staff were exposed to the **COVID-19** virus.

111.    Survival rates of confirmed **COVID-19** infected patients who survive between ages 20-50 is 99.98%, and between ages 50-70 is 99.5%. Plaintiffs and all others similarly situated are all aged between 20 and 70. Many of them have acquired natural immunities, and their chances of survival are much higher than these figures. In other words, there is no statistical benefit to Ascension Health in terms of reduced mortality over baseline levels arising from the Vaccine Mandate.

112.    Therefore, there is no legitimate business purpose furthered by the policy.

113.    The federal government has tied various financial incentives and payments to Ascension Health's compliance with its vaccination objectives.

114.    Although counsel for Plaintiffs and all others similarly situated have significantly limited their liability for fees, Plaintiffs and all others similarly situated have incurred attorney's fees and costs in bringing this action.

---

[23] CDC Website (https://www.cdc.gov/vaccines/covid-19/provider- enrollment.html).

## COUNT I – DECLARATORY ACTION

115.    Plaintiffs incorporates all previous paragraphs herein.

116.    There are four tests to determine when a private party is acting under the color of state law: the Nexus Test, the Public Function Test, the Joint Action Test, and the Symbiotic Relationship Test. *Wittner v. Banner Health,* 720 F.3d. 770, 777 (10th Cir. 2013).

117.    Defendant is subject to constitutional limitations when they act as a state actor.

118.    "For a private party to qualify as a state actor under the nexus test, a plaintiff must demonstrate that there is a sufficiently close nexus between the government and the challenged conduct by the private party such that the conduct 'may be fairly treated as that of the State itself." *Janny v. Gamez,* 8 F.4th 883, 925 (10th Cir. 2021)(internal citations omitted).

119.    A close nexus exists when "the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* (internal citations omitted).

120.    "The "public function" test asks whether the challenged action is a traditional and exclusive function of the state." *Wittner*, 720 F.3d. at 776–77 (10th Cir. 2013)(citing *Flagg Bros. Inc. v. Brooks,* 436 U.S. 149, 157–58, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)).

121.    Defendant is a state actor under both the Public Function Test and the Nexus Test, since it is undertaking public health functions traditionally the exclusive prerogative of the state, and has been coerced and significantly encouraged by the federal government to violate the Plaintiffs', and all others' similarly situated, Constitutional rights.

122.    It is manifestly obvious that, but for the encouragement and coercion of the federal government, the Defendant would not undertake such a destructive and irrational policy as terminating healthcare workers in the midst of a pandemic but for the federal government's myriad policies designed to coerce Defendant into adopting the Vaccine Mandate.

123.    In other words, the federal government has entered into the Defendant's decision-making process, such that the Defendant's choices may be deemed those of the federal government.

124.    There is a bona-fide, actual and present need for a declaration over the relative rights and duties between the Plaintiffs and all others similarly situated and the Defendant, and this declaration is not propounded from mere curiosity or to obtain legal advice.

125.    Pursuant to Fed. R. Civ. P. 57, the Court may order a speedy hearing of this declaratory action.

126.    This Court should declare that the Defendant is a state actor relative to the Vaccine Mandate, and that Plaintiffs and all others similarly situated are entitled to statutory and constitutional protections that apply to government actors.

127.    Pursuant to 42 U.S.C. § 1983, Plaintiffs and all others similarly situated is entitled to temporary, preliminary, and permanent injunctive relief restraining Ascension Health from enforcing the Vaccine Mandate.

WHEREFORE, Plaintiffs, and all others similarly situated request a declaration that Defendant is a state actor relative to the Vaccine Mandate, and that Plaintiffs are entitled to statutory and constitutional protections that apply to government actions.

## COUNT II – VIOLATION OF THE RIGHT TO PRIVACY

128.    Plaintiffs incorporates all previous paragraphs herein.

129.    Since the Defendant is a state actor, it is subject to constitutional limitations and scrutiny.

130.    The Vaccine Mandate violates Plaintiffs' and all others' similarly situated right to privacy guaranteed under the Kansas Constitution.

131.   The United States Supreme Court has directed lower courts to test a compelled vaccination law against the constitution of the individual state. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 26 (1905).

132.   Kansas law provides that compelling unwanted "medical treatment" violates Kansas's fundamental right to privacy and citizen's constitutional right to refuse unwanted medical treatments. *Stockwell v. State*, 54 Kan. App. 2d 325, 328, 399 P.3d 873, 875 (2017). "[A]ny compelled intrusion into the human body implicates significant, constitutionally protected privacy interests." *Missouri v. McNeely*, 569 U.S. 141, 143 (2013).

133.   If a challenged action implicates a fundamental right, strict scrutiny is employed. *Hodes & Nauser, MDs, P.A. v. Schmidt,* 309 Kan. 610, 669, 440 P.3d 461, 496 (2019).

134.   The Vaccine Mandate is a medical treatment which, when unwanted, violates Plaintiffs' right to refuse medical treatment and invades Plaintiffs' fundamental right to privacy.

135.   By their nature, vaccines extend far beyond the workplace into a person's private or home life, alter one's physical person, and permanently modify a citizen's being – the opposite of a temporary and *de minimus* interference.

136.   The Defendant's Vaccine Mandate facially interferes with its employees' right to refuse unwanted medical treatments, implicates Plaintiffs' fundamental right to privacy, and is presumptively unconstitutional.

137.   "The burden shifts to the government to establish the requisite compelling interest and narrow tailoring of the law to serve it." *Id.*

138.   The Vaccine Mandate violates Plaintiffs' right to privacy guaranteed by the federal Constitution and secured by the Fourteenth Amendment. "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment[.]" *Cruzan by Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 261, 278 (1990). "The forcible injection of medication into a

nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper,* 494 U.S. 210 (1990); *see also Washington v. Glucksberg,* 521 U.S. 702, 725 (1997) ("Given the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment, our assumption was entirely consistent with this Nation's history and constitutional traditions.").

139.    The threat of termination of employment is, by nature, coercive. *See, e.g., Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Rick Scott,* 717 F.3d 851, 874 (11th Cir. 2013) ("In effect, the State is offering its employees this Hobson's choice: either they relinquish their Fourth Amendment rights and produce a urine sample which carries the potential for termination, or they accept termination immediately ... To begin with, we do not agree that employees' submission to drug testing, on pain of termination, constitutes consent under governing Supreme Court case law"). "Employees who must submit to a drug test or be fired are hardly acting voluntarily, free of either express or implied duress and coercion." *Id.*

140.    The Plaintiffs and all others similarly situated must all submit to vaccination "or be fired[,] are hardly acting voluntarily, free of either express or implied duress and coercion." *Id.*

141.    There is a bona-fide, actual and present need for a declaration over the relative rights and duties between the Plaintiffs and all others similarly situated and Defendant, and this declaration is not propounded from mere curiosity or to obtain legal advice.

142.    Pursuant to Fed. R. Civ. P. 57, the Court may order a speedy hearing of this declaratory action.

143.    This Court should declare that the Vaccine Mandate is presumptively unconstitutional under Kansas right to privacy laws, the Kansas Constitution, and under the 14th Amendment of the Constitution; and therefore, the Defendant must prove that the Vaccine Mandate furthers a compelling state interest using the least restrictive means.

WHEREFORE, Plaintiffs and all others similarly situated request a declaration that the Vaccine Mandate is presumptively unconstitutional under Kansas right to privacy laws, the Kansas Constitution, and/or under the 14ᵗʰ Amendment of the Constitution; therefore, Defendant must prove the Vaccine Mandate furthers a compelling state interest using the least restrictive means.

## COUNT III –
## VIOLATION OF THE KANSAS PRESERVATION OF RELIGIOUS FREEDOM ACT

144.   Plaintiffs incorporates all previous paragraphs herein.

145.   Since Defendant is a state actor as it pertains to the Vaccine Mandate, it is subject to constitutional limitations and scrutiny.

146.   The Vaccine Mandate violates Plaintiffs' and all others' similarly situated right to religious freedom guaranteed by the Kansas Bill of Rights § 7 and the Kansas Preservation of Religious Freedom Act, K.S.A. 60-5301 *et seq.*

147.   The United States Supreme Court has directed lower courts to test a compelled vaccination law against the Constitution of the individual state. *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 26 (1905).

148.   The free exercise of religion is a protected right. U.S.C.A. Const. Amend. 1; K.S.A. Const. Bill of Rights, §7.

149.   The Kansas Supreme Court observed "that the wording of this section of our Bill of Rights is much more in detail respecting religious freedom than is the First Amendment to the federal constitution." *State v. Smith*, 155 Kan. 588, 594 (1942).

150.   Kansas law provides a person's right to exercise religion shall not be substantially burdened. K.S.A. §65-5303.

151.   The Vaccine Mandate violates Plaintiffs' and all others' similarly situated fundamental right of the free exercise of religion.

152.     Under Kansas law, the challenged action must show that the burden of infringing on a person's religious freedoms is in furtherance of a compelling interest and is the least restrictive means possible.

153.     "[O]nly those interests of the highest order and not otherwise served can overbalance the fundamental right to the exercise of religion." K.S.A. §60-5304.

154.     The interest in stopping or slowing the spread of COVID-19 "cannot qualify as [compelling] forever." *Does 1-3 v. Mills,* -- S. Ct. ---, 2021 WL 5027177 at *3 (Oct. 29, 2021) (Gorsuch, J., dissenting).

155.     Defendant's Vaccine Mandate fails to be the least restrictive means possible.

156.     "A person whose exercise of religion has been burdened, or is substantially likely to be burdened, in violation of [K.S.A. 60-5301 *et. seq*] may assert such claim or defense". K.S.A. §60-5303.

WHEREFORE, Plaintiffs and all others similarly situated request an order for injunctive relief granting Plaintiffs' motion for a temporary restraining order filed contemporaneously with this Petition, an Order declaring Defendant's actions are in violation of Kansas law, actual damages, and that Plaintiffs and all others similarly situated be awarded their attorneys' fees and costs incurred in connection with this action and any such other and further relief the Court deems fair and just.

## COUNT IV – VIOLATION OF TITLE VII

157.     Plaintiffs incorporates all previous paragraphs herein.

158.     Pursuing administrative remedies with the EEOC under Title VII or the Kansas Commission on Human Relations under Kansas law would be futile, because neither statute provides discriminated employees with access to emergency injunctive relief.[24]

159.     In 2017, the Attorney General of the United States published a memorandum titled Federal Law Protections for Religious Liberty. The AG's memo begins by reciting the primary significance of religious liberty in the United States[25]:

> Religious liberty is a foundational principle of enduring importance in America, enshrined in our Constitution and other sources of federal law. As James Madison explained in his Memorial and Remonstrance Against Religious Assessments, the free exercise of religion "is in its nature an unalienable right" because the duty owed to one's Creator "is precedent, both in order of time and in degree of obligation, to the claims of Civil Society." Religious liberty is not merely a right to personal religious beliefs or even to worship in a sacred place. It also encompasses religious observance and practice. Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law. Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming.
>      ... In the United States, the free exercise of religion is not a mere policy preference to be traded against other policy preferences. It is a fundamental right.

160.     Title VII of the Civil Rights Act prohibits Defendant from discriminating against Plaintiffs and all others similarly situated because of their sincerely held religious beliefs. 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . religion . . . .").

---

[24] Injunctive relief is not one of the available forms of relief under the Kansas Act Against Discrimination or the Kansas Human Rights Commission Rules and Regulations. And, Title VII only provides for injunctive relief in the context of a settlement agreement between the EEOC and an employer.

[25] Federal Law Protections for Religious Liberty, 82 Fed. Reg. 49668-01, 49668 (oct. 26, 2017).

161. Defendant has a duty under Title VII to provide religious exemptions and accommodations to those with sincerely held religious objections to the Vaccine Mandate.

162. By broadly denying Plaintiffs' request for religious accommodation, Defendant is violating federal law's requirement that sincerely held religious belief be protected and accommodated. *Id.*

163. There is a bona-fide, actual and present need for a declaration over the relative rights and duties between Plaintiffs and all others similarly situated and Defendant, and this declaration is not propounded from mere curiosity or to obtain legal advice.

164. Pursuant to Fed. R. Civ. P. 57, the Court may order a speedy hearing of this declaratory action.

165. Pursuant to Title VII and Kansas's Act Against Discrimination, this Court should declare that Defendant has engaged in unlawful religious discrimination.

166. Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Ascension Health from enforcing the Vaccine Mandate.

WHEREFORE, Plaintiffs request a declaration under 42 U.S.C. § 1983 that Defendant is violating Title VII by discriminating against Plaintiffs' religious beliefs, and any other action this Court deems fair and just.

## COUNT V – VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS

167.     Plaintiffs incorporates all previous paragraphs herein.

168.     The First Amendment of the United States Constitution guarantees that "Congress shall make no law respecting an establishment of religion".

169.     The Fourteenth Amendment to the United States Constitution extends the protections of the First Amendment to actions taken by state and local governments and state and local government officials.

170.     Defendants are State Actors as properly plead in Count I.

171.     When Defendant denied Plaintiffs religious exemption from the Covid-19 vaccine requests it knew that Plaintiffs' were protected under the First Amendment – namely, the right to freely exercise their religious beliefs.

172.     When Defendant denied Plaintiffs' religious exemption from the Covid-19 vaccine requests it did so for the purpose of abridging Plaintiffs' First Amendment right to practice their religion freely.

173.     When Defendant denied Plaintiffs religious exemption from the Covid-19 vaccine requests, it did so for the purpose of abridging Plaintiffs' First Amendment rights by retaliating against Plaintiffs, whose religious practices oppose the Covid-19 vaccine.

174.     Defendant denied Plaintiffs religious exemption from the Covid-19 vaccine requests willfully, knowingly and intentionally.

175.     On or about November 12, 2021, when Defendant

176.     As a direct and proximate result of Defendant's actions, Plaintiffs have suffered and continue to suffer from actual and emotional damages.

177.     Defendant is liable to Plaintiffs for violating his First and Fourteenth Amendment rights, pursuant to 42 U.S.C. §1983.

WHEREFORE, Plaintiffs requests that they be awarded actual and punitive damages, together with their attorneys' fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further relief as this Court deems just.

Respectfully Submitted,

**PROTZMAN LAW FIRM, LLC**

By:     /s/ Andrew Protzman
         Andrew B. Protzman, KS #18015
         Ben Stelter-Embry, KS #25891
         4001 W. 114th Street, Suite 110
         Leawood, KS 66211
         Phone: (816) 421-5100
         Fax: (816) 421-5105
         Email: andy@protzmanlaw.com
                ben@protzmanlaw.com

**Counsel for Plaintiffs**